Paul **MILSTEIN** and Bessie N. Shapiro, as shareholders of GAF Corporation, in the right of GAF Corporation, Plaintiffs,

v.

Jesse **WERNER** et al., Defendants.

Elaine **MENDELSON**, Plaintiff,

v.

John A. **COLEMAN** et al., Defendants.

Nos. 70 Civ. 2178 (MP), 70 Civ. 5420.

United States District Court, S. D. New York.

Dec. 13, 1972.

Stroock & Stroock & Lavan, New York City, for plaintiff Milstein by Louis Loss, Cambridge, Mass., David Lubart, Charles G. Moerdler, Stephen A. Block, Robert P. Stein, New York City, of counsel.

Mortimer S. Levine and Mortimer Shapiro, New York City, for plaintiff Shapiro.

Bennett Frankel, New York City, for Deborah Glickman.

Abraham I. Markowitz, New York City, for plaintiff Mendelson.

Simpson, Thacher & Bartlett, New York City, for individual defendants by Whitney North Seymour, Sr., Rolon W. Reed and Charles E. Koob, New York City, of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendant GAF Corp. by Edwin J. Wesely and Richard A. Horgan, New York City, of counsel.

Richard A. Ash, Objecting Stockholder, pro se.

Baer & McGoldrick, New York City, for Objector Cletus M. Lyman by John J. McLaughlin, New York City, and Cletus P. Lyman, Philadelphia, Pa., of counsel.

Abraham Gemunder, Objecting Stockholder, pro se.

POLLACK, District Judge.

Following more than two years of intensive, informed, and involved pre-trial proceedings, the parties to these consolidated derivative suits brought by stockholders on behalf of GAF Corporation have submitted a proposed "global" settlement, concluding not only all claims and issues raised in the pleadings herein but also related controversies—both of an individual and derivative character—involving non-party GAF shareholders, the corporation, and the Milsteins.

On September 22, 1972, this Court, having received a copy of the proposed settlement, entered an order approving a form of notice to be sent to all shareholders of a hearing to be held on November 17, 1972. The purpose of the hearing was to receive proof on the fairness, reasonableness and adequacy of the settlement.

At the hearing, the proponents of the settlement presented supporting documentary data and affidavits and provided as witnesses three experts, who were examined and cross-examined on various aspects of the proposal. In addition to representatives of stockholders who supported the proposed settlement, there were also present and heard the owners or counsel for owners of an aggregate of 554 shares of GAF. Approximately 25 letters of objection were received in evidence emanating from other shareholders, representing some 4,519 shares of stock. There are approximately 130,000 shareholders in GAF holding a total of about 16,800,000 shares outstanding as of the present time. Notice of the hearing was sent to all of these holders. Thus, the total number of shares responding, either objecting or asking for further information, was less than $3\frac{1}{100}$ of one percent of the total shares outstanding and advised of the hearing.

A preliminary objection was raised at the hearing as to the sufficiency of the notice given for the hearing. It was contended that not enough time was afforded between the sending of notice and the hearing date to allow objectors to prepare a reasoned opposition. It was further contended that the proponents of the settlement plan should have been required to submit the reasons for favoring the settlement in advance of the time at which objecting shareholders were required to file and serve their objections. Several of the shareholders who objected by letter to the settlement complained that the Court approved notice, which summarized the content of the settlement proposal, was not easily susceptible of a layman's understanding.

In defense of the notice, the proponents established that copies of the notice of hearing were sent to all GAF stockholders on or before October 10, 1972, the date fixed by the Court's order therefor and that, in addition, extra copies were sent both to those banks and trust companies normally requesting GAF documents and to the financial editors of the daily press most likely to be read by persons interested in financial matters, *viz.*, The Wall Street Journal, The New York Times, The Washington Post, The Los Angeles Times, and The International Herald Tribune. Furthermore, it was revealed that the objectors to the

adequacy of the time to object in fact had learned of the settlement discussions from press reports in advance of the date the notice was mailed to shareholders and had visited the offices of counsel for plaintiffs and for defendants to discuss the plan.

■ Notice to shareholders of a hearing to review the compromise of a derivative suit must be structured in terms of time and content to enable shareholders to rationally decide whether they should intervene in the settlement proceedings or otherwise make their views known and, if they choose to do so, to have sufficient opportunity to prepare their position. *See* Air Lines Stewards & Stewardesses Ass'n Local 550 v. American Airlines, 455 F.2d 101, 108 (6th Cir. 1972); Miller v. Steinbach, 268 F.Supp. 255, 283 (S.D.N.Y.1967); Marcus v. Textile Banking Co., 38 F.R.D. 185, 187–188 (S.D.N.Y.1965); Winkelman v. General Motors Corp., 48 F.Supp. 490, 493–494 (S.D.N.Y.1942); 7A Wright & Miller, Federal Practice and Procedure § 1839 (1972). Indeed, reasonable notice with a fair recital of the subject matter and proposed terms and opportunity to be heard are attributes of due process. *See* Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

■ In the instant case, ample notice was provided by an eight page printed brochure, sent 38 days in advance of the hearing, which identified the actions being terminated, detailed the course of the litigations and adequately and reasonably presented the terms of settlement. While the narrative is somewhat lengthy and involved, the complexity of this litigation and the comprehensiveness of the settlement precluded a cursory summation. *See Winkelman, supra,* 48 F.Supp. at 493–494. Oversimplification might have increased readibility to some, but only at the cost of accuracy and necessary completeness. Thus, this Court held on November 17, 1972 that the notice was sufficient, timely and reasonably clear to the minimally sophisticated layman and satisfied the requirements of due process and of Rule 23 of the Federal Rules of Civil Procedure. Accordingly, the Court overruled the threshold objection to a consideration of the fairness and adequacy of the plan.

On the basis of the record herein and of the Court's familiarity with the litigations and the extensive pretrial proceedings conducted under the Court's supervision since inception of the case, the Court finds that the proposed settlement has been arrived at in good faith, represents the exercise of reasonable business judgment, and is fair, reasonable and adequate and should be approved. The settlement was negotiated in an adversary context and is free of any taint of self-interest personal to the plaintiffs herein. The resolution of the controversies involved in the manner proposed will serve the best interests of all the shareholders and of the corporation and represents demonstrable benefit, both present and future, to the corporation. In amplification of the foregoing, the further findings of the Court are as follows.

### I. *Background: The Pleadings*

#### a. *The Milstein suit*

On May 27, 1970, Paul Milstein, a stockholder of GAF purportedly owning as of that date in excess of 60,000 shares of common stock and 94,000 shares of preferred, commenced this shareholders' derivative suit against the officers and directors of GAF asserting three basic claims which were later revised and supplemented with two further claims in the Amended and Supplemental Complaint (the "Complaint").

First, it is alleged that Dr. Jesse Werner, GAF's President, Chairman, and Chief Executive and a party defendant herein, controlled, selected, and dominated the corporation's Board of Directors and that the Board over several years had been induced wrongfully to pay Werner excessive compensation, repre-

senting a waste and spoliation of corporate assets. The complaint alleged that of the eleven directors serving in 1970, at the most only three were independent and in no way affiliated with GAF; and that the directors had failed to exercise independent judgment in the premises and indeed only one member of the Board—Seymour Milstein, brother of the plaintiff—had dissented on *any* vote between 1966–70.

As an example of the claimed excessiveness, the complaint stated that in 1969, Werner received, (i) $175,000 by way of salary, (ii) 6,000 shares of common stock valued at approximately $13⅞ per share, or approximately $83,000, (iii) more than $20,000 in terms of the present value of annual retirement benefits under the pension plan and (iv) 62,000 shares of common stock at $5⅜ per share under GAF's restricted stock option plan when the market price was $26⅞, thus providing an unrealized benefit to him of $1,333,000 thereon. The aggregate of these 1969 items of compensation is alleged to have exceeded $1,500,000.

Second, it is alleged that GAF's 1969 Plan for the Sale of Restricted and Unrestricted Stock to Employees Who Perform Executive, Supervisory and Administrative Functions (hereinafter "the Plan" or "Stock Purchase Plan") was invalidly adopted by the GAF directors and that the approval of the stockholders thereto had been invalidly procured. The complaint alleged that the directors were self-interested in the Plan because of their potential participation in it and were purportedly further interested in the Plan due to the alleged domination by Dr. Werner, who would benefit from the Plan.

Additionally, it was claimed that the proxy statement seeking stockholder approval of the Plan contained misrepresentations, false statements and omissions of material fact. Specifically, that the statement represented that the purpose of the Plan was to "attract, employ and retain executives and employees of outstanding abilities"; that, as to "unrestricted shares" sold under the Plan, the employee-recipient "must agree to remain in the employ of the Corporation . . . for a period of not less than two years" and, as to "restricted shares", for a period of not less than three years. The complaint asserted that most, if not all, of the persons eligible under the Plan and those who were recipients thereunder, were at that time already under contract to continue for some time in the employ of GAF.

The proxy statement issued had stated that, "It is not possible at this time to determine the employees to whom the Corporation may offer to sell shares under the Plan, the number of employees to whom the offers to sell may be made, the number and kind of shares the Corporation may offer to sell to any individual employee or the prices . . . at which shares will be sold. Such determinations will be made by the Committee from time to time in the future." In this regard the complaint alleged that, in fact, the individuals who would benefit, the number and kinds of shares to be offered, and the price at which the shares would be offered were known to defendants or various of them at the time the proxies were solicited.

The proxy statement had asserted further that the administration committee for the Plan might "in its discretion permit part payment for the shares, in an amount not exceeding seventy-five percent of the purchase price thereof, by a promissory note or notes of the employee" and that the interest rate on such note might be fixed at "not less than five percent per year" and payable "within six years from the date of purchase." The complaint alleged that, in fact, it had already been determined that six percent would be the annual interest rate and that the term of such notes would be six years, but that such determinations were not made by the Committee administering the Plan.

The foregoing are asserted to be violative of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (the "1934 Act") and Rule 14a–9 promulgated thereunder by the SEC.

Third, it is alleged that the defendants engaged in acts which constituted a derogation of their fiduciary duties and/or a waste and spoliation of GAF's corporate assets. Specifically, it is alleged that:

(a) the Board continued dividends on GAF common stock subsequent to 1968 even though earnings from operations fell below 40¢ per share. This continuation was allegedly designed to enable recipients of restricted stock pursuant to the Plan to receive dividends which would more than cover the interest payments on the notes they had given to GAF to pay for 75% of the purchase price of stock acquired pursuant to the Plan;

(b) the directors caused GAF to misstate or to omit fully and accurately to state its true financial picture, improperly inflating and/or misstating sales, earnings, income, profits and other financial data and generally engaging in manipulation of the financial picture of GAF so as to create a false and misleading impression about its financial stability and health;

(c) the Board did not properly limit compensation to executive officers, particularly Dr. Werner, but rather endowed them with excessive compensation;

(d) the Board provided inadequate reserves for receivables and bad debts and while outstanding receivables increased since 1966 the reserves decreased;

(e) the Board allowed and encouraged GAF to engage in monetary hedging and currency speculation; and

(f) the Board generally *mismanaged* the business of GAF and defaulted in its responsibilities to GAF with the result that expenditures and liabilities were improperly increased and earnings reduced and the business reputation of the Company suffered. Allegedly, outside directors did not receive adequate financial information, whereas inside directors— as officers—received monthly financial reports different and more extensive than the information given to the entire Board. With this incomplete information the outside directors were purportedly ill-prepared to provide an external check and vigil for inside management.

In committing the aforementioned acts, it is charged that the defendants violated Sections 10(b) and 14(a) of the 1934 Act, 15 U.S.C. §§ 78j(b) and 78n(a), as well as the regulations promulgated thereunder.

Fourth, it is alleged that in violation of the 1934 Act, GAF purposefully sold its Amiben production facilities to Amchem Products, Inc. with a concurrent leaseback transaction solely to create an allegedly extraordinary profit for 1970 of some $2,377,310. That, in creating this profit, defendants allegedly impaired the financial condition of GAF and wasted corporate assets by renegotiating a supply contract with Amchem to reduce the price GAF received for a product and to eliminate certain penalty provisions advantageous to GAF. And that, the accounting procedure applied to this transaction was improper.

Fifth, it is alleged that in violation of the 1934 Act, improper accounting treatment was accorded to the sale by GAF's English subsidiary of its Stourton House headquarters in London; that the extraordinary gain of over $3,923,000, included as a net item in 1970, purportedly belonged in the 1971 statement.

The amended and supplemental complaint had included as defendants the accounting firm of Haskins & Sells, but this defendant was dismissed on consent, without prejudice.

In their Answers, the defendants denied all material allegations of the complaint, denied any substantive violations of state or federal law, and additionally, alleged affirmatively that the plaintiff Milstein did not sue in truth on behalf of

the corporation but used the vehicle of this suit to increase his influence in GAF and to review the stockholders' negative vote on plaintiff's proposed slate for board of directors which was defeated in the 1971 annual election. The defendants also asserted certain counterclaims which were later dismissed on motion by the plaintiff as not properly assertable against a plaintiff suing in a derivative capacity.

### b. *The Mendelson suit*

Elaine Mendelson, a GAF stockholder, commenced an independent suit in this Court on December 10, 1970, asserting claims and seeking relief similar to that described *supra*. On January 14, 1972, this Court consolidated the *Mendelson* suit with the *Milstein* suit, and additionally allowed plaintiff Bessie Shapiro to intervene in the Milstein suit, adopting as if her own the complaint therein.

### II. *Discovery and Pre-trial Proceedings*

Once issue was joined in the Milstein suit, the parties undertook an energetic program of discovery and of pre-trial motions and conferences with the Court. This enabled the Court to observe the diligence, the tenaciousness, and the effectiveness with which the parties proceeded. Indeed, vigor became the *leit motiv* of the litigation. It is certain beyond cavil that these parties put themselves in a position to be able to fairly evaluate the merits of the case and the defenses thereto. And it is certain that the parties came to appreciate the determination of each other.

Plaintiff's discovery began in earnest late in 1970, as GAF commenced the production of what eventually resulted in approximately 14,500 pages of numbered documents, in addition to serving 65 pages of answers and objections to plaintiff's interrogatories. The taking of depositions commenced on January 5, 1971 and continued intermittently for over six months. During that period, plaintiff deposed eight of the defendant directors, including Dr. Werner, as well

as two non-party GAF former officers. These depositions produced more than 1,700 pages of transcripts and inquired into every facet of the complaint. It was this discovery which led plaintiff to file the amendments to his complaint and those were followed by further discovery allowed by the Court.

### III. *The Terms of Proposed Settlement*

The proposed settlement embraces all of the claims and all of the issues raised by the complaint (as amended) and additionally reaches out to absorb other actual and threatened litigation. A principal purpose of the settlement is to take the officers of GAF out of the courtroom and restore them full time to the corporate board room and business.

The settlement agreement, dated September 22, 1972, provides that the Board of Directors of GAF will adopt a resolution which, in effect, will amend the Stock Purchase Plan to provide that future sales of stock under the Plan shall be at a price of not less than 50% of the last closing price of GAF common stock on the New York Stock Exchange. Under the Plan as adopted in 1969, and as in effect when this suit was commenced, the minimal price was pegged at 20% of the market price. There are presently 458,000 shares remaining available for sale under the Plan, which shares are to be offered periodically in small blocks. The modification of the Plan as stated is to be in compromise and full settlement of the claims asserted against the defendants in the consolidated complaint or arising out of or in connection with the matters or transactions set forth therein.

The agreement further provides for the settlement and termination of all of the other pending derivative lawsuits asserting claims similar to those asserted in these consolidated actions. This includes New York state court actions asserting claims similar to those asserted in the consolidated actions and commenced by the plaintiffs Milstein, Mendelson and Shapiro, as well as a similar

Delaware action, brought by Deborah Glickman, pending in the Delaware Court of Chancery (New Castle County Civil Action No. 3413) since October 2, 1970. Furthermore, the agreement provides that when the complaints in the consolidated action are dismissed, there shall be a closing, and all outstanding disputes and litigation shall be terminated and finally discontinued between the Company and certain of its past and present directors and officers on the one hand, and Paul, Seymour, and the late Morris Milstein and Gloria Milstein Flanzer (the "Milsteins"), the GAF Stockholders Protective Committee and its members and Circle Floor Co., Inc. ("Circle") on the other hand, with the exception of any claims arising out of the ordinary course of business between the Company and Circle. This portion of the agreement covers the three suits pending in this Court, *viz.*, the Company's suit against the Milsteins asserting violation of Section 13(d) of the 1934 Act, the Company's antitrust suit against the Milsteins and Circle Floor Co., Inc., a Milstein company [this has already been dismissed and dismissal affirmed on appeal], and the Milstein suit against directors and GAF alleging proxy solicitation violations under the 1934 Act [preliminary injunction heretofore denied].

## IV. *Benefits and Objections*

The proponents of the settlement claim that it provides measurable financial benefit to GAF as well as important intangible corporate benefits. The former is represented by the increase from 20% to 50% for the minimum price for sale of stock under the 1969 Stock Purchase Plan. For the year 1972, the average market price of GAF common stock is given at $24 per share, and assuming that the price will remain at this level or increase (due to the improved management structure of GAF and to the favorable economic forecasts for the nation and this business) the proponents claim that GAF will receive additional consideration at least of $3,297,600 * for the remaining 458,000 shares of restricted stock under the Plan. The increased consideration purportedly will also result in a lower charge against GAF's future earnings, due to the reduced discount on the purchase price. This reportedly will increase GAF's earnings position and will stimulate further growth in the value of the stock.

The plaintiffs attribute to the effect of this lawsuit changes in the management and in the financial picture of GAF for which they claim certain credit. For example, one charge in the complaint was that inside officers were receiving information unavailable to the outside directors. One month after commencement of this suit, GAF began to circulate the insiders' report to all directors, thus insuring a parity of information and a greater chance of outside supervision. Additionally, since 1970, GAF's earnings from operations have improved to the point where the 40¢ per share annual common dividend is no longer being jeopardized. The company has been able to maintain the dividend without using reserves or accumulated surplus. GAF has, moreover, closed or reduced certain operations which, in the plaintiffs' view, had not been operating profitably. Plaintiffs further contend that various corporate procedures were tightened up as a result of the criticisms expressed in this suit, accounting in part for the better operations and results mentioned.

More significantly, the plaintiffs note that since the suit was instituted there has been a substantial and significant change in the composition of the Board of Directors. Whereas the complaint alleged that only three of eleven directors were truly outsiders, at present only four are officers or consultants to GAF. The plaintiffs say:

> While it is impossible to place a monetary value on the above-outlined changes in GAF's structure and op-

---

* Based on proponent's assumptions.

erations, in fact, since their institution GAF's performance has improved and its stockholders have benefitted. Indeed, in terms of the future growth, and strength of GAF and the consequent growth of shareholder's investments, these changes may be as important as the above-outlined change in the Stock Purchase Plan, as a result of which GAF will receive additional consideration of $3,297,600.

And again, the proponents emphasize that this is a "global" settlement, wiping away at once the consolidated suits and other time-consuming and intensely conducted litigation.

The objectors argue that the settlement is illusory and that it unjustifiably snuffs out a substantial right of action of the corporation. Specifically, they assert that persons who "wrongfully" purchased shares at a discount should have made restitution to the corporation. But the short answer to this is that no evidence has been adduced which demonstrates any wrongdoing on the part of either the named defendants or the corporation in the adoption and operation of the Stock Purchase Plan. Although the complaints filed herein *do* allege certain violations, it is frequently the case that claims placed in the starting gate of a suit prove to be no more than *in terrorum* devices and often are scratched at various turns in the discovery proceedings and often fail by the time of trial to show up with competent evidence.

 The objectors argue further that the Plan is too broad, not especially advantageous to the Company and at all events that the potential beneficiaries should be restricted, seemingly to exclude all but newly recruited executives or personnel being lured by other companies. It is appropriate to note that it is not the function of this Court to undertake the management of the internal affairs of a corporation or to review the Board of Directors' determinations on management compensation unless gross excesses or other fiduciary breaches are seen. *See* Clamitz v. Thatcher Mfg. Co., 158 F.2d 687, 692 (2d Cir.), cert. denied, 331 U.S. 825, 67 S.Ct. 1316, 91 L.Ed. 1841 (1947).

The evidence presented at the hearing as to incentive stock plans of other companies convinces this Court that the revised Plan, in allowing present executives to purchase stock under the Plan, does not require judicial intervention. A study by expert management consultants comparing the compensation practises and levels of GAF with the typical compensation levels and practises of companies in roughly similar business and of similar size showed that GAF's incentive compensation and Stock Option Plan and the levels of award were typical and reasonable. A comparison of stock option plans of 21 major companies showed that a majority permit purchases at from one percent to 30 percent of market price. The GAF Plan, if anything, is more stringent than the average perhaps in its terms both as to price and loans.

Additionally, one objector at the hearing and in his affidavit argued that the plaintiffs should have sought summary judgment on the validity of proxy solicitations for 1971 and 1972, claiming that violations of Rule 14a–9 could have been proven on the basis of the factual record on file. This objection is plainly speculative and asks the Court to decide as a matter of law what constitutes proper litigation strategy; moreover, the likelihood of a successful summary judgment motion in this Circuit in a stockholder's suit based on the matters here involved is not to be assumed.

After thorough analysis and evaluation of the product of the pre-trial phases of this litigation, with the benefit of expert assistance of specialized SEC and accounting advisors and management consultants, it was the conclusion of plaintiffs' counsel that this litigation might well fail so far as the primary claim—excessive compensation—was concerned, because they well knew that only

a handful of excessive compensation cases have been won by stockholder-plaintiffs. The evaluation by the expert of the employees' stock purchase plan in comparison with similar plans of other organizations placed success, on the issue to be litigated in that connection, in a dubious position.

Beyond those issues, much of the financial data accumulated did not bear out the allegations in the complaint and the plaintiffs' counsel entertained sufficient doubt about their ability to prove other allegations to suggest that an appropriate settlement, not merely any settlement, would be the advisable course to take.

With respect to the plaintiffs' claims concerning the proxy statements used to obtain approval of the stock purchase plan and their alleged violation of Rule 14a–9 of the SEC proxy rules, it was the judgment of plaintiffs' counsel that even assuming they had won on the merits, in all probability, the maximum relief which they could foresee would be an order requiring resolicitation on the basis of a corrected proxy statement. Since Rule 14a–9 is basically a disclosure mechanism, the plaintiffs' counsel reason that it would be extremely difficult to persuade a Court to cancel permanently all stock issued pursuant to a plan ratified by the shareholders on the basis of solicitation of proxies in violation of the rule. The most that a Court would do, according to the opinion of plaintiffs, would be to require a resolicitation on corrected material.

There exists precedent for this viewpoint of the plaintiffs and it was therefore appropriate for them to take this into account in the overall evaluation of the desirability of settlement as distinct from further litigation of the issues. These considerations posed the probability of actually losing ground for the stockholders by further litigation of the proxy issues. On a resolicitation the management of GAF, which had not actively taken a position in the actual so-licitation, would have opposed any thrust in the direction of changing the terms of the stock purchase plan, including such a change as the settlement is designed to accomplish. Plaintiffs' counsel appreciated that in corporate solicitations, inertia usually favors the management in proxy contests. The plaintiffs had particular reason to be sensitive on this score, because after a very hard fought and extremely expensive proxy contest seeking to change the management in 1971, the dissident stockholders had lost to the management by a vote of two to one.

As a further point solidifying the judgment of the proponents to settle the controversies embraced herein, they properly note that the Milstein family holds a large stake in GAF. They hold 324,166 shares of preferred stock and 237,600 shares of common stock of GAF. These interests link their support of the plan of settlement inextricably to the company's best interests so far as concerns a balancing of the chances of success of the litigation which Paul Milstein initiated as against the desirability of the compromise presented to the Court for approval.

## V. The Standards to be Applied

In presenting to this Court a proposed settlement, the parties herein have determined that the risks and the costs of trial are far outweighed by the advantages for each side contained in the settlement. This Court, in reviewing the settlement pursuant to Fed.R. Civ.P. 23.1, should not make the parties prove the accuracy of any and all statements contained in the pleadings; the purpose of the compromise was to avoid such a task. See Schleiff v. Chesapeake & Ohio Ry. Co., 43 F.R.D. 175, 178 (S.D. N.Y.1967). Nor should the Court make the proponents of the agreement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest

hopes. All that is required is that the proponents show that the agreement fairly, reasonably and adequately serves the interest of the corporation, on behalf of which the instant suit was launched more than 2½ years ago. Zerkle v. Cleveland-Cliffs Iron Company, 52 F.R.D. 151, 159 (S.D.N.Y.1971); Glicken v. Bradford, 35 F.R.D. 144, 151 (S.D. N.Y.1964).

■ The settlement proposed herein was the product of good faith bargaining, in which skilled counsel battled long and hard in the interest of their respective clients. Having invested several years and hundreds of working hours readying this case for trial, counsel for the plaintiffs nevertheless concluded that this case is more wisely settled on favorable terms than tried on a shaky hope of success. Litigation is notoriously uncertain. There is no question but that the settlement inures to the benefit of the corporation, and it is equally certain that the vibrations produced by this litigation shook the management structure into more favorable alignments. Continuing the suit in the face of legal hurdles and legal fees is not in the interest of the corporation. It is time to file the briefs and store the documents: the attention of all parties should be returned to their normal business pursuits.

The objections raised and discussed, *supra,* provide no justifiable reason for disapproving of this plan or its terms. The proponents have clearly met their burden of proof, showing the settlement to be fair, reasonable and adequate, negotiated at arm's length, and reached on the considered judgment of those fully aware of the factors and the strengths in the litigations and matters involved. In arriving at my conclusion as to the fairness and reasonableness of the settlement, I do not single out any factor as decisive. I have considered the combination of all the elements involved.

Accordingly, counsel for both sides are well advised in recommending the settlement and this Court approves it and directs its consummation. An appropriate judgment may be submitted in conformity with Fed.R.Civ.P. 54(a). The judgment shall provide that upon the decree becoming final allowances of fees and disbursements to those entitled thereto will be fixed and entered at the foot of the decree. The Court will retain jurisdiction for said purpose and for the enforcement and satisfaction of the decree.

Submit judgment accordingly within five days hereof.

So ordered.