# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00373-CV

**David Allen Hall, Appellant**

v.

**Pedernales Electric Cooperative, Inc.; John Worrall, individually and as representative of others similarly situated; Glenn Van Shellenbeck, individually and as representative of others similarly situated; Linda Evans, individually and as representative of others similarly situated; Bennie R. Fuelberg; Will Dahmann; W.W. "Bud" Burnett; E.B. Price; O.C. Harmon; R.B. Felps; Val Smith; and Vi Cloud, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. D-1-GN-07-002234, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## **O P I N I O N**

Appellant David Allen Hall appeals from a final judgment approving the settlement agreement in a class action lawsuit filed by appellees John Worrall, Glenn Van Shellenbeck, and Linda Evans (collectively, the "Class Representatives"), against Pedernales Electric Cooperative, Inc. ("PEC") and a group of current and former PEC officers and directors (the "Individual Defendants"). Hall, a member of the class who objected to the terms of the settlement, argues on appeal that the trial court erred in certifying the class, appointing the class counsel and class representatives, and approving the settlement. We affirm the trial court's judgment.

## STANDARD OF REVIEW

The Texas Supreme Court has held that "[a]pproval of a class action settlement is within the sound discretion of the trial court and should not be reversed absent an abuse of that discretion." *General Motors Corp. v. Bloyed*, 916 S.W.2d 949, 955 (Tex. 1996). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). In reviewing a trial court's judgment approving a class-action settlement agreement, "the appellate court must not merely substitute its judgment for that of the trial court." *Bloyed*, 916 S.W.2d at 955.

## BACKGROUND

PEC is a non-profit entity, organized as a Texas electric cooperative corporation owned by its members and subject to the Texas Electric Cooperative Corporation Act. *See* Tex. Util. Code Ann. §§ 161.001-.254 (West 2007). PEC is the largest electric cooperative in the United States, serving 24 Texas counties. Any individual who purchases electricity through metered service with PEC is a member and owner of the cooperative.

In July 2007, the Class Representatives filed suit for declaratory and injunctive relief against PEC and its individual officers and directors, bringing claims of negligence, gross negligence, breach of contract, and breach of fiduciary duty. These claims were based on various allegations of mismanagement, self-dealing, and excessive compensation. The Class Representatives sought class certification, disgorgement of misappropriated funds, removal of PEC's officers and directors, damages for excessive compensation and improper expenditures, as well as multiple

2

declarations regarding alleged wrongdoing by PEC. The Class Representatives later amended their petition to add causes of action for constructive fraud, aiding and abetting breach of fiduciary duty, civil conspiracy, tortious interference with contract, and, in the alternative, a derivative proceeding on behalf of PEC. *See* Tex. Bus. Corp. Act art. 5.14 (West 2003).

The Class Representatives asserted in their pleadings that PEC and the Individual Defendants concealed excessive officer and director compensation and benefits by omitting this information from federal income tax forms and posted misleading information on the PEC website. The pleadings further alleged that the Individual Defendants breached their fiduciary duties by purchasing Envision, a wholly owned subsidiary, without proper due diligence, failing to require competitive bidding for software billing services provided by Envision, and funneling millions of dollars of PEC capital to Envision without proper due diligence or justification. The Class Representatives also accused PEC general manager Bennie R. Fuelberg of "failing to provide notice of Board meetings, calling Board meetings at the last minute, having telephonic Board meetings (and not disclosing the call-in number), prohibiting member-owner attendance at workshops, claiming to have no email accounts, and having no direct PEC telephone numbers" in an attempt to conceal material information regarding the use of PEC funds.

Finally, the Class Representatives took issue with PEC's handling of surplus funds representing its accumulated retained excess of revenues over expenses. These funds, which are allocated annually to PEC members in proportion to the amount of electricity purchased by each member, are referred to as "patronage capital" and are held in trust by PEC for the benefit of the members. Under the Electric Cooperative Corporation Act, an electric cooperative such as PEC

3

is required to periodically return patronage capital to its members. *See* Tex. Util. Code Ann. § 161.059(d). The Class Representatives alleged that at the time suit was filed, PEC had never returned patronage capital to its members, reported how patronage capital was being used, or notified the members of their individual patronage capital account balance, despite the fact that PEC had reported patronage capital in amounts ranging from $1.2 million to $2.2 million between 2002 and 2006. PEC justified this decision by citing a resolution passed at a 1987 board meeting, in which the directors resolved to refrain from returning patronage capital to the members until PEC achieved at least a 40% asset to equity ratio. The Class Representatives urged that this 40% threshold "was arbitrarily selected by the Individual Defendants, is virtually impossible to meet, and was never disclosed by them to the Plaintiff Class prior to the filing of this litigation."

While suit was pending, PEC began taking steps to remedy issues raised by the Class Representatives. These measures included amending its bylaws to make the director-election process more open and democratic, posting federal income tax forms on its website, and creating a mechanism to begin returning patronage capital to the members. Fuelberg resigned as general manager, forfeiting $600,000 in deferred compensation, and his replacement, Juan Garza, publicly voiced his commitment to bringing transparency and open governance to PEC. Board President W.W. "Bud" Burnett also resigned, and the "coordinator" position he had held at PEC—a position that had been criticized by the Class Representatives for its lack of value to the cooperative and that involved a compensation package of approximately $200,000 per year—was eliminated.

In January 2008, the trial court suspended discovery and hearings in order to facilitate settlement negotiations. On February 8, 2008, the parties filed a Rule 11 agreement, dismissing the

4

non-voting advisory directors of PEC as defendants, as well as Barry Adair, a voting director who was not yet on the board at the time of the alleged wrongdoing. PEC's board of directors then voted to delegate authority to the dismissed directors to consider and approve settlement on PEC's behalf. The parties ultimately reached a settlement agreement, and on April 9, 2008, written notice of the settlement agreement was mailed to each of the approximately 220,000 PEC members, notifying them that they were members of the settlement class, that they had a right to object to the settlement, and that a fairness hearing would be held on April 30, 2008. Notice was also published in every newspaper within PEC's service area and posted on the PEC website, along with a copy of the full settlement agreement and the Class Representatives' live petition.

Under the terms of the settlement agreement, the settlement class released all related claims against PEC, its past and present officers, directors and employees, and its attorneys, insurers, and agents. PEC and the Individual Defendants also released any claims related to the suit against any other party, including the settlement class. In exchange for this release, PEC agreed to retire $23 million in patronage capital by bill credits to members over a period of five years, undergo and pay for a "comprehensive and independent review of the financial and management operations of the PEC" by Navigant Consulting, an independent consulting firm, and pay the Class Representatives' attorneys' fees and other court costs, up to an amount of $4 million. The settlement agreement also stated that the suit would proceed as a non-opt-out class action. *See* Tex. R. Civ. P. 42(b)(2).

On April 30, 2008, the trial court held an evidentiary hearing on the fairness of the settlement and certification of the settlement class. At the hearing, which was continued on May 5,

5

the trial court allowed members of the settlement class to voice their objections. The trial court also reviewed and considered over 200 written objections that were filed by class members.[1]

Following the fairness hearing, the trial court signed a final judgment approving the settlement, certifying the class, appointing class counsel and representatives, and awarding attorneys' fees and costs to the Class Representatives in the amount of $4 million. Hall, a class member who objected to the settlement, filed this appeal.[2]

**DISCUSSION**

Hall raises the following arguments on appeal: (1) that the settlement agreement was not properly approved by the parties and that the approval was based on improper motivations, (2) that notice to the settlement class was inadequate, (3) that the trial court erred in appointing class representatives and class counsel, (4) that the trial court erred in failing to appoint interim class counsel, (5) that the settlement agreement presented a conflict of interest between PEC and its attorneys, (6) that the settlement agreement is unconscionable, (7) that the trial court improperly "procrastinated" in certifying the settlement class, (8) that the trial court erred by facilitating settlement negotiations between the parties, (9) that the trial court's approval of the settlement was based on a "faulty prediction of the complexity, expense, and likely duration of continued litigation,"

---

[1] The trial court's docket sheet reflects that 268 objections were filed by the May 2, 2008 filing deadline.

[2] Two other class members also filed notices of appeal, but this Court, by order dated November 21, 2008, dismissed one of those appellants on his own motion and the other for want of prosecution.

and (10) that the trial court erred in certifying the class. Because Hall failed to preserve error regarding a number of these arguments, we must first address the issue of waiver.

*Waiver of Error*

An unnamed class member who objects to a settlement at a fairness hearing has standing to appeal the trial court's decision to disregard his objections. *Devlin v. Scardelletti*, 536 U.S. 1, 9 (2002); *City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 752 (Tex. 2003). However, the fact that unnamed, objecting class members may appeal their objections to a class settlement does not suggest that such class members are exempt from the requirement that complaints must be properly raised in the trial court in order to be preserved for appellate review. *See* Tex. R. App. P. 33.1(a); *see also Northrup v. Southwestern Bell Tel. Co.*, 72 S.W.3d 1, 13 n.20 (Tex. App.—Corpus Christi 2001, no pet.) ("It is quite possible that while an unnamed class member may have *standing* to bring an appeal, he may have waived certain issues by failing to adequately present them to the trial court."). Furthermore, an appellant may not rely on the objections of other class members to preserve issues not raised in his own objections, as the Supreme Court held in *Devlin* that an unnamed class member "will only be allowed to appeal that aspect of the District Court's order that affects him—the District Court's decision to disregard *his* objections." 536 U.S. at 9 (emphasis added); *see also Citizens Ins. Co. v. Daccach*, 217 S.W.3d 430, 449 (Tex. 2007) (observing that in class action context, Texas courts may rely on "persuasive federal decisions and authorities interpreting current federal class action requirements"). As a result, Hall's issues on appeal are limited to those matters raised in his written objections to the settlement agreement.

A generous reading of Hall's written objections reveals that he has properly preserved his appellate complaints that the notice to the settlement class was insufficient and that the settlement agreement is unconscionable.[3] Hall also appeared at the fairness hearing and made an oral request for interim class counsel. While this request was made after the deadline for filing objections, we will consider the issue to be preserved for appellate review. In addition, while Hall does not raise a specific point of error on appeal regarding the fairness, adequacy, and reasonableness of the settlement agreement, his brief includes an extensive discussion of this issue. Because the question of whether the trial court erred in approving the settlement agreement turns on the fair-adequate-and-reasonable inquiry and because PEC concedes on appeal that Hall's objection sufficiently preserved this matter for appellate review, we will address it as well. The remainder of Hall's complaints on appeal were not addressed in his objections to the trial court and are therefore waived.[4] We will now address those issues for which error was preserved.

---

[3] Hall's written objections, filed April 14, 2008, do not appear in the record on appeal. Upon review of the trial court's docket sheet, it appears that the written objections of Martin Reeves, which were filed April 23, 2008, and bear the notation, "Prepared by: David Allen Hall," were mistakenly recorded on the docket as Hall's objections, and were subsequently designated for inclusion in the appellate record as such. PEC has included Hall's actual objections as an appendix to its brief. While this document does not appear in the record, we note that it is essentially identical to the objections of Martin Reeves, which were prepared by Hall and identified as Hall's objections on the docket. We will therefore rely on the Reeves objections to represent the substance of Hall's objections.

[4] While Hall makes an equitable argument that certain problems with the settlement were not fully revealed until the fairness hearing, we note that the hearing, which began on April 30, 2008, was continued to a second day on May 5, 2008, in order to accommodate additional objections filed prior to the May 2 filing deadline. The issues Hall complains of on appeal—all of which were at least preliminarily addressed during the first day of the fairness hearing—could have been raised by written objection prior to the deadline.

*Notice to the Settlement Class*

Hall raises a number of arguments regarding the notice to the settlement class, claiming that it failed to sufficiently explain the underlying controversy or settlement terms, that it did not afford ample time for members to file objections, that newspaper publication of the notice was inadequate to reach all class members, and that additional discovery should have been conducted and made available to class members prior to dissemination of the notice.

The present suit was certified as a class action under rule 42(b)(2), which applies to class actions involving injunctive and declaratory relief. *See* Tex. R. Civ. P. 42(b)(2). When a 42(b)(2) action is certified, personal notice to the members is permitted but not required. Tex. R. Civ. P. 42(c)(A) ("For any class certified under Rule 42(b)(1) or (2), the court may direct appropriate notice to the class."). If a settlement agreement is reached, however, "[n]otice of the material terms of the proposed settlement . . . shall be given to all members in such manner as the court directs." Tex. R. Civ. P. 42(e)(1)(B). "The mechanics of the process of giving notice of a proposed settlement are left to the discretion of the court subject to the reasonableness standards imposed by due process." *Ball v. Farm & Home Sav. Ass'n*, 747 S.W.2d 420, 424 (Tex. App.—Fort Worth 1988, writ denied). To satisfy due process, notice should be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "[T]here are no rigid standards governing the contents of notice, and numerous decisions have approved very general descriptions of the proposed settlement." *Ball*, 747 S.W.2d at 425.

Prior to dissemination, the notice in the present case was reviewed and approved by both the trial court and Charles Silver, a professor who testified at the fairness hearing as an expert in class-action litigation. The notice, which was mailed directly to all PEC members and published in 33 local and regional newspapers, informed the members that a class action settlement had been reached in a lawsuit involving "allegations of wrongdoing by the PEC, its directors and management." The notice further provided a brief summary of the material terms of the settlement, including the plan to retire $23 million in patronage capital, an award of attorneys' fees, expenses, and bonuses to the class representatives not to exceed $4 million, the Navigant review, and the release of related class action and derivative claims. The notice directed members to the PEC website to view copies of the settlement agreement and the Class Representatives' live petition, provided a telephone number where members could obtain additional information, provided details regarding the upcoming fairness hearing, and explained the procedure for filing written objections to the settlement. Finally, the settlement contained the following notice:

> YOUR RIGHTS WILL BE AFFECTED BY THESE LEGAL PROCEEDINGS. IF THE COURT APPROVES THE PROPOSED SETTLEMENT, YOU WILL HAVE NO FUTURE RIGHT TO CONTEST THE FAIRNESS, REASONABLENESS OR ADEQUACY OF THE PROPOSED SETTLEMENT, OR TO PURSUE THE RELEASED CLAIMS.

While Hall contends that the notice is inadequate because it fails to fully describe the details of the underlying controversy or the settlement agreement, "class members need not 'be made cognizant of every material fact that has taken place prior to the mailing of their individual notice.'" *Peters v. Blockbuster, Inc.*, 65 S.W.3d 295, 308 (Tex. App.—Beaumont 2001, no pet.) (quoting

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104 (5th Cir. 1977)). Significantly, the notice in this case provided members with a telephone number to obtain additional information, as well as the website where both the settlement agreement and the plaintiffs' live petition was available. "Generally, a notice which prompts class members to investigate and which gives the class members the information they need to obtain complete information about the settlement is adequate." *Peters*, 65 S.W.3d at 308. While Hall speculates that PEC members in rural areas may not have adequate Internet access to review materials on the PEC website, the provision of a telephone number to obtain additional information sufficiently resolves this concern. In light of the notice's summary of the settlement terms, as well as the guidance provided for those seeking additional information, we hold that the notice in this case was adequate to inform the members of the material provisions of the settlement agreement. *See id.* (finding notice adequate where class members were informed "that they may obtain a copy of the agreement by contacting class counsel or by visiting [the defendant's] web-site.").

Hall also argues that newspaper publication of the settlement was inadequate because "in some publications" the text was "too small for many people to decipher," and because "[a]ll but a handful of counties within the PEC service area rely on weekly newspapers," rather than daily newspapers. Hall does not contend that the weekly newspapers failed to print the notice, but that members relying on weekly newspapers had less time to file written objections before the fairness hearing. However, the notice was not only published in 33 local and regional newspapers but also directly mailed to each PEC member and published on the PEC website. As a result, any inadequacies in the newspaper publication were sufficiently cured by more direct forms of notice.

11

*See Mullane*, 339 U.S. at 318 ("Where the names and post-office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency.").

Hall also argues that the notice, which was mailed to members on April 8, 2008, did not allow for sufficient time to file objections before the April 28, 2008 deadline. The April 28 deadline was actually extended to May 2, 2008, when the trial court continued the hearing to a second day in order to accommodate additional objections.[5] There is no minimum time frame that must be allowed for the filing of objections, but the notice must "afford a reasonable time for those interested to make their appearance." *Ball*, 747 S.W.2d at 424. We conclude that the trial court was not unreasonable in allowing a total of 24 days between issuance of the notice and the deadline for filing objections. *See U.S. v. Alabama*, 271 Fed. Appx. 896, 901 (11th Cir. 2008) (not designated for publication) (holding that "the district court did not abuse its discretion in providing for two weeks' notice before objections were due"); *see also Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977) (holding that 26 days between mailing of notice and deadline for opting out of class was "more than adequate").

Finally, Hall argues that additional discovery should have been conducted prior to the mailing of the notice and that sealed discovery should have been made available to the class members. This argument, though couched among Hall's complaints regarding the form and

_____

[5] The notice actually stated that objections filed by April 28 would be considered at the April 30 fairness hearing, and that objections filed between April 28 and May 2 would be considered and ruled on by the trial court after the hearing. Because the hearing was completed on May 5, all objections filed by May 2 had been reviewed and considered by the court at that time.

substance of the notice, appears to be an attack on the trial court's decision to approve the settlement, rather than on a perceived deficiency in the notice. In light of our determination that the trial court did not abuse its discretion in approving the settlement, *see* discussion *infra*, we overrule this issue as well.

*Interim Class Counsel*

Hall argues that the trial court erred by not appointing interim class counsel as authorized by Texas Rule of Civil Procedure 42(g)(2)(A), which provides that a trial court "may designate interim counsel to act on behalf of the putative class before determining whether to certify the action as a class action." Tex. R. Civ. P. 42(g)(2)(A). By the plain language of the rule, the appointment of interim counsel is discretionary, rather than mandatory. Furthermore, the trial court did appoint interim counsel in this case, in an April 2, 2008 order provisionally approving the settlement and provisionally appointing as class counsel and class representatives those individuals who were later confirmed in the final order. Hall argues that the trial court should have appointed additional interim counsel, other than the attorneys representing the Class Representatives, to review the settlement agreement. Hall provides no authority to support this argument, but contends that the class members were entitled to "objective legal interpretation" of the complex issues involved in the litigation.

Because Texas Rule of Civil Procedure 42, governing class actions, was patterned after the federal equivalent, Federal Rule of Civil Procedure 23, Texas courts "rely on our precedents and persuasive federal decisions and authorities interpreting current federal class action requirements." *Daccach*, 217 S.W.3d at 449. The advisory committee note on federal rule 23

13

elaborates on the appointment of interim class counsel when necessary to conduct discovery or otherwise prepare for certification, stating, "Ordinarily, such work is handled by the lawyer who filed the action. In some cases, however, there may be rivalry or uncertainty that makes formal designation of interim counsel appropriate." Fed. R. Civ. P. 23 advisory committee's note.[6] This language suggests that the purpose of the rule authorizing interim class counsel is to clarify which of a group of competing attorneys may act on behalf of the putative class prior to certification. The rule does not appear to contemplate, as Hall contends, that a trial court abuses its discretion in failing to seek out and appoint additional interim counsel for the purpose of reviewing a settlement agreement negotiated by the named plaintiffs' counsel. As a result, we overrule this issue on appeal.

*Unconscionability*

Hall argues that the settlement agreement is void as an unconscionable contract. Several of Hall's points on this issue—that the unnamed class members did not assist in drafting the agreement, that settlement negotiations took place in an "opaque atmosphere" because members were not aware of its terms until they received notice of the upcoming fairness hearing, and that the unnamed class members had no bargaining power with which to negotiate the settlement terms—can be summarized as a general public policy argument against class action settlements.

---

[6] "Although not binding, the interpretations in the Advisory Committee Notes 'are nearly universally accorded great weight in interpreting federal rules.'" *Horenkamp v. Van Winkle & Co.*, 402 F.3d 1129, 1132 (11th Cir. 2005) (quoting *Vergis v. Grand Victoria Casino & Resort*, 199 F.R.D. 216, 218 (S.D. Ohio 2000)).

The procedural rules governing class actions include mechanisms for protecting unnamed class members when a settlement is reached. *See Bloyed*, 916 S.W.2d at 953 ("One of the foremost objectives of Rule 42 is to protect the interests of absent class members."). Rule 42 provides every class member the right to object to a proposed settlement, Tex. R. Civ. P. 42(e)(4), and requires the trial court to find that the agreement is fair, reasonable, and adequate before approving it, Tex. R. Civ. P. 42(e)(C). In determining whether to approve a settlement agreement, the trial court must consider, among other factors, "the respective opinions of the participants, including . . . the absent class members." *Bloyed*, 916 S.W.2d at 955. Furthermore, we are bound to enforce rule 42, which authorizes the settlement of class action litigation by the class representatives. *See* Tex. R. Civ. P. 42(e); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("[C]ourts must be mindful that the [class action] rule as now composed sets the requirements they are bound to enforce."). We further note the impracticality of allowing approximately 220,000 class members to participate in settlement negotiations and that one of the purposes of the class action mechanism is to alleviate the logistical problems of having an unwieldy number of potential plaintiffs. *See* Tex. R. Civ. P. 42(a) (providing that class action suit may not be filed unless "the class is so numerous that joinder of all members is impracticable"); *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471 (5th Cir. 1986) ("The purpose of class actions is to conserve 'the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion.'") (quoting *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982)). Therefore, in light of the rules authorizing class action settlements and the

15

procedural protections in place for unnamed class members, we overrule Hall's policy arguments regarding the settlement negotiations.

Hall further argues that the settlement agreement in this case is an unconscionable contract because its terms are oppressive and unreasonable. Specifically, he contends that the agreement's release of liability constitutes a "windfall of immunities" for PEC and the Individual Defendants, while the benefits to the class members in the form of patronage capital credits are "illusory" because "the membership owns the credits." The terms of the settlement agreement do not, as Hall claims, provide "global releases for all claims, not just those related to the instant case." Rather, the agreement extends the release of liability to claims "based upon, relating to, arising out of, connected to, or subsumed within allegations that have been asserted" in the underlying suit. Such a release is hardly uncommon in the class action settlement context. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 106 (2d Cir. 2005) (observing that "[b]road class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits"); *Berardinelli v. General Am. Life Ins. Co.*, 357 F.3d 800, 805 (8th Cir. 2004) ("There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded. In fact, most settling defendants insist on this."). Furthermore, while the patronage capital credits are in fact held by PEC in trust for the individual members, the utilities code merely requires PEC to return patronage capital to its members "periodically" and in a "manner determined by the board." Tex. Util. Code Ann. § 161.059(d). Under the terms of the settlement agreement, the members benefit from a guaranteed retirement of $23 million in patronage capital in the form of bill credits. While Hall points out that

16

the board of directors voted in November 2007 to begin disbursing bill credits, general manager Juan Garza testified at the fairness hearing that the positive changes in PEC policies and procedures, including the decision to retire patronage capital, were a direct result of the ongoing litigation. As a result, we disagree with Hall's characterization of the patronage capital bill credits as "illusory."

Hall cites several other settlement terms that he considers oppressive and unreasonable, including the provision holding PEC, rather than the Individual Defendants, liable for the $4 million attorneys' fees and costs award, the lack of opt-out rights for class members, the Navigant review of PEC operations, and the provisions preserving the benefits of unspecified oral agreements between PEC and its individual officers and directors, oral trusts benefitting individual employees, and future retirement benefits for Burnett, the former president of the board. Beyond basic statements regarding contract unconscionability, Hall has not provided us with any authorities supporting his arguments that these particular provisions are oppressive and unreasonable. Each of these provisions was addressed at the fairness hearing, and we do not find them to be so oppressive or unreasonable as to render the agreement unconscionable.

Hall's argument regarding the payment of the attorneys' fees and costs award is that PEC's insurer should shoulder "all defense and settlement costs, less a $125,000 deductible," and that the Individual Defendants should be held personally liable for some portion of the costs. At the fairness hearing, evidence was presented that PEC's insurer had agreed to cover $2.4 million of the attorneys' fees and costs award, and that the remaining $1.6 million would come solely from PEC funds. Professor Silver, who testified as an expert in class actions and insurance law, stated, "I think the class is lucky to be getting 2.4 million of [the attorneys' fee and cost award] from the insurance

17

company. . . . I was looking through the complaint and the settlement and thinking about whether the insurance companies were obligated to pay any part of these losses, and really, I've had trouble finding anything that they would have to pay." Further, PEC's insurer issued a reservation of rights to contest coverage for the claims raised in the Class Representatives' petition, citing potentially applicable exclusions in PEC's insurance policy for, among other things, losses in connection with claims arising from improper gain or profit, fraud, or breach of contract.

The possibility for recovery from the Individual Defendants was similarly problematic. Garza testified at the fairness hearing that officers and directors of PEC are subject to an indemnification resolution that was passed by the board in 1987. This resolution, which was entered into evidence, states that PEC will "indemnify and hold harmless, individually, all officers and directors of the Cooperative, General Manager Fuelberg and General Counsel Moursund against any legal action that might be brought against any of them in relation to their services to" PEC. *See* Tex. Util. Code Ann. § 161.078 (authorizing electric cooperatives to "indemnify and provide indemnity insurance in the same manner and to the same extent as a nonprofit corporation"). Professor Silver testified that "it is very uncommon to get contributions from individual officers and directors of defendant corporations" in class action litigation, and that even if the Individual Defendants were held personally liable in this case, PEC would likely be required to reimburse them under the indemnification agreement. In light of this evidence, the payment provisions of the settlement agreement do not appear to be so oppressive and unreasonable as to render the agreement unconscionable.

Hall's argument regarding opt-out rights, in its entirety, is that "PEC members lose the right to pursue individual litigation. Paragraph 1.15 quashes all members' rights to opt-out of

18

the settlement." Rule 42(b)(2) specifically allows for a class action with no opt-out rights for class members where, as here, the class seeks declaratory and injunctive relief. Hall has not demonstrated that this provision renders the settlement agreement unconscionable.

Hall also voices concern that the Navigant review is not "labeled as an audit." This matter was addressed by Garza's testimony at the fairness hearing, in which he stated, "[B]ecause Navigant is not an auditing firm, we refer to it as an investigation, but essentially it is a very detailed look at all the financial transactions that have occurred for the prior ten years, and then a look at our management practices going forward." The use of an "investigation" rather than an "audit" does not appear to be an unreasonable and oppressive contract provision, and Hall has provided us with no authority to the contrary.

Regarding Hall's complaints of unspecified oral agreements or trusts, the agreement merely states that it does not waive or release claims for rights or benefits to which PEC officers, directors, or employees would otherwise be entitled under other agreements, including "any oral or written agreement with PEC" and that any trusts set up by PEC employees are included in the group of entities released from liability. The agreement goes on to state that the provision regarding oral agreements "shall not create such rights or benefits, nor shall it revive rights or benefits that have been waived or released separately and independently" of the settlement agreement. Garza testified at the fairness hearing that he was not aware that any unspecified oral agreements or trusts existed, and no evidence to the contrary appears in the record. As a result, these provisions do not serve to render the settlement agreement unconscionable.[7]

---

[7] The provision protecting separate agreements with employees is also the basis for Hall's complaint regarding Burnett's retirement benefits. This complaint relies solely on facts outside the record and cannot be considered.

Because Hall has not demonstrated that the settlement agreement is an unconscionable contract, we overrule this issue on appeal.

*Was the Settlement Agreement Fair, Adequate, and Reasonable?*

The Texas Supreme Court has provided six factors that a trial court must take into account when determining whether a proposed class settlement is fair, adequate, and reasonable. *Bloyed*, 916 S.W.2d at 955. These factors are: (1) whether the settlement was a product of fraud or collusion, (2) the complexity, expense, and likely duration of the litigation, (3) the stage of the proceedings and amount of discovery completed, (4) the factual and legal obstacles to the plaintiffs' success on the merits, (5) the possible range of recovery and certainty of damages, and (6) the respective opinions of the participants, including class counsel, class representatives, and absent class members. *Id.*; *see also Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982).

Appellate review of the trial court's approval of a class settlement is limited, due to "the strong judicial policy favoring the resolution of disputes through settlement." *Parker*, 667 F.2d at 1209; *see also Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir. 1980) (settlements favored because "they produce an amicable resolution of disputes and minimize demands on judicial time and resources"). On appeal, "an approved settlement will not be upset unless the court clearly abused its discretion." *Id*. In reviewing whether the trial court's approval of the settlement agreement was a clear abuse of discretion, we will address each of the six factors described in *Bloyed*. 916 S.W.2d at 955.

1.  *Fraud or Collusion*

In the final judgment approving the settlement, the trial court made the following finding:

20

> [T]he Court finds that there is no evidence of fraud, collusion, or willful misconduct in respect to the determination to settle, rather, the Court finds that the Settlement was the result of arm's length negotiations, after extensive discovery and briefing on the merits, and based on intelligent evaluation of the lawsuit by the parties and their counsel.

Hall's assertions that the agreement was the product of fraud or collusion are based primarily on his dissatisfaction with the settlement terms and the fact that the absent class members were not involved in the negotiation process. The mere fact that a proposed settlement agreement was reached without the input of absent class members does not render the agreement the product of fraud or collusion. As previously discussed, the trial court allowed absent class members to file objections, and reviewed and considered all objections before approving the settlement agreement. *See* Tex. R. Civ. P. 42(e)(4) (providing absent class members right to object to proposed settlement).

To the extent that Hall accuses the trial court itself of fraud or collusion with the parties, there is no evidence to support these allegations. The trial court's involvement in class settlement negotiations was not improper because, "[w]hile the trial court generally plays a relatively detached role in most civil proceedings, in a class action the court is the guardian of the class interest." *Bloyed*, 916 S.W.2d at 954. As the guardian of this interest, the court has an "inherent power to manage the class action," *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 225 (5th Cir. 1981), and is required "to police the proceeding to minimize conflicts of interest and, primarily, to protect absent class members," *Bloyed*, 916 S.W.2d at 954.

In light of the trial court's express finding that the settlement agreement was not the product of fraud or collusion and the lack of evidence to the contrary, we hold that this factor weighs in favor of approval of the settlement agreement.

21

## 2. *Complexity, Expense, and Likely Duration of the Litigation*

In its order approving the settlement agreement, the trial court stated, "Had the case not settled, it is likely that the litigation, and any certain appeal, would continue for years; the parties would incur immense attorneys' fees and cause continued disruption to all." Hall, however, argues that "little of the relief sought [by the class] remains unrealized," and therefore the future complexity, expense, and likely duration of the litigation is minimal.[8] In describing the relief sought by the class, Hall focuses solely on the positive governance changes made by PEC during the pendency of the litigation and ignores the other benefits accruing to the class members as a result of the settlement agreement, including the $23 million patronage capital retirement and submission to the Navigant review of PEC's business and financial records. The achievement of positive governance changes, while a benefit to the class, does not reduce the complexity, expense, or likely duration of future litigation related to the remaining forms of relief sought by the class.

Furthermore, the trial court emphasized at the fairness hearing that future litigation would be particularly disruptive in this case, stating:

> When people get up in the morning, they walk over to the wall, they flip their switch and the lights come on, and that's the way it should be. That's the reason we call it "a utility." It is essential to the schools, to the businesses, to the people who live within that service area, and we need not interfere with that in the least. And so one of my goals in supervising this litigation was to try to minimize the disruption that occurred to that essential primary business, which was the continuing providing of power to that service area.

---

[8] Hall also claims that PEC's insurer, rather than PEC, will be responsible for the expenses of continued litigation. This assertion is inaccurate. Having fully discussed the issue of PEC's insurance coverage, we need not address it further.

22

Under the circumstances, it was not unreasonable for the trial court to conclude that the complexity, expense, and likely duration of continued litigation weighed in favor of approving the settlement.

### 3. Stage of the Proceedings and Amount of Discovery Completed

"A trial court correctly analyzes this factor by determining whether sufficient discovery has been conducted to allow the parties to make an informed decision about the relative merits of the case and the settlement." *Johnson v. Scott*, 113 S.W.3d 366, 372 (Tex. App.—Beaumont 2003, pet. dism'd). The trial court should also consider "whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995). In its order approving the settlement, the trial court found that at the time settlement negotiations began, "[t]hirteen depositions had been taken and almost 25,000 pages of documents had been exchanged. Pending before the Court were six Motions for Summary Judgment and one Motion to Dismiss."

Hall argues that the class members cannot "assess their position in a settlement negotiation" until the Navigant review is completed, or until any potential legislative or criminal investigations are completed. However, the record reflects that a substantial amount of discovery had been conducted at the time the settlement agreement was approved, including depositions of key individuals and the production of almost 25,000 pages of documents. Under these circumstances, we cannot conclude that the trial court erred in finding that sufficient discovery had been conducted to allow the parties to make an informed decision about the relative merits of the case and the settlement. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 87 (2d Cir. 2001) (holding that "stage of

23

proceedings" factor weighed in favor of settlement approval where "the parties had engaged in an extensive exchange of documents and other information").

### 4. Factual and Legal Obstacles to the Plaintiffs Prevailing on the Merits

"In deciding whether a clear abuse of discretion has occurred, . . . absent fraud or collusion, the most important factor is the probability of the plaintiffs' success on the merits." *Parker*, 667 F.2d at 1209. A number of potential obstacles were discussed in the fairness hearing, including the issue of whether a derivative claim could be brought against an entity governed by the Electric Cooperative Corporations Act, the question of whether the PEC board of directors could be removed under the Texas Nonprofit Corporations Act, and the issue of class action certification, which the trial court stated was "problematic" because "there has not been a class action approved by the Texas Supreme Court since 2000, that I know of." The trial court also stated at the hearing that the plaintiffs' case relied heavily on "novel theories."

In addition, several potentially dispositive motions were pending before the court at the time of the fairness hearing, including the defendants' motion for summary judgment based on the statute of limitations, the Individual Defendants' motion for summary judgment based on a lack of duty to the plaintiffs, the defendants' partial motion for summary judgment on standing, the defendants' motion for partial summary judgment based on a lack of contractual damages to plaintiffs, the defendants' motion for partial summary judgment on the breach of contract claim relating to patronage capital, and the defendants' motion to dismiss for failure to comply with the trial court's order on special exceptions. In its order approving the settlement, the trial court found that its rulings on these motions could potentially change "the legal landscape of the case."

24

In reference to this factor, Hall argues that the "[p]laintiffs have already realized nearly every requested remedy." Like many of Hall's previous arguments, this statement ignores the fact that a significant portion of the benefits to the class were realized only as a result of the settlement agreement. In addition, the fact that the class has received numerous benefits as a result of this litigation, derived either from the settlement agreement or from PEC's positive internal changes prior to settlement, does not necessarily have bearing on the probability of the plaintiffs' success on the merits, as these changes may have been prompted, at least in part, by the extensive media attention and attendant public outcry regarding this case. Given the factual and legal obstacles to the plaintiffs' success on the merits, the trial court did not abuse its discretion in finding that this factor weighed in favor of approving the settlement.

### 5. *Range of Recovery and Certainty of Damages*

The trial court and the parties emphasized during the fairness hearing that any recovery of monetary damages would likely be paid by PEC—and by extension, its members—rather than the Individual Defendants or PEC's insurer. Garza addressed this issue in his testimony, stating, "There is no magical source of money here. The money comes from our members. . . . [T]hat's been my frustration with this lawsuit, that the only source of funds is our membership."

Furthermore, the plaintiffs' chances of obtaining relief at trial are uncertain in light of the previously discussed obstacles to the plaintiffs' success on the merits. Given this uncertainty and the fact that most, if not all, monetary damages would come from the members themselves, we hold that the trial court was not unreasonable in finding that this factor supported approval of the

25

settlement agreement. *See Johnson*, 113 S.W.3d at 374 (where certainty of damages is elusive, this factor could reasonably support approval of settlement).

### 6.   *Opinions of the Participants*

The class counsel, the class representatives, and the defendants each expressly stated their approval of the settlement agreement in this case. Of approximately 220,000 absent class members, 268 objections were filed. The trial court stated on the record that it reviewed and considered each of these objections. Further, the trial court addressed the objections at the fairness hearing, explaining to the class members in attendance why issues commonly raised by the objections could not feasibly be incorporated into the final settlement agreement. While the trial court was required to consider the opinions of absent class members, the mere existence of objections is not sufficient to render the agreement unfair, inadequate, or unreasonable. "[I]nherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y.1972)). Given the trial court's careful consideration of the members' objections, as evidenced by the lengthy discussion of these concerns during the fairness hearing, we hold that the trial court sufficiently considered the opinions of the participants, including class counsel, class representatives, and absent class members, before approving the settlement agreement.

Based on our review of the six factors set forth in *Bloyed*, we hold that the trial court did not commit a clear abuse of discretion in approving the settlement agreement as fair, adequate, and reasonable.

## CONCLUSION

Because we overrule each issue that was properly preserved on appeal, we affirm the trial court's judgment in its entirety.

_____

Diane M. Henson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed:   March 5, 2009